**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

BARBARA A. BATTLE, etc.,

        Plaintiff,

vs.	Case No. 3:06-cv-782-J-32TEM

GOLD KIST, INC., etc., et al.,

        Defendants.

---

**ORDER[1]**

This diversity wrongful death action is before the Court on Defendant's Third Daubert Motion/ Motion To Strike/ Motion In Limine As To Dr. Donald Freedman (Doc. 86); Plaintiff's Daubert Motion To Exclude Defendant's Expert Toxicologist Testimony And Blood Test Results (Doc. 90), and Plaintiff's Amended Rule 26(a)(2) and Rule 37(c)(1) Motion To Strike Affidavit Of Dr. Bruce A. Goldberger And Hearsay Witness Statements (Doc. 129); and Defendant's Motion To Strike Plaintiff's Supplemental Memorandum. (Doc. 144.) The parties have filed responses and numerous exhibits in support of their respective positions. (Docs. 93, 94, 95, 96, 97, 111, 113, 122, 127, 130, 141, 142,145.) The Court conducted an evidentiary Daubert[2] hearing on August

---

[1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it is intended to decide the motions addressed herein and is not intended for official publication or to serve as precedent.

[2] See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-93, 597 (1993).

11, 2008. At issue is whether laboratory evidence of marijuana use found post-mortem in the deceased's urine and blood is admissible, thereby giving defendant's expert forensic toxicologist a basis to testify at trial that the deceased was impaired at the time of the accident, contributing to his death.

## I.   Background

Plaintiff Barbara Battle, as personal representative of the estate of Jeremy Christian Norton, the decedent, alleges that an employee of defendant Gold Kist, Inc. negligently operated a forklift, striking and killing Mr. Norton while he was working inside a farm chicken house as "chicken catcher." Norton died at approximately 8:00 a.m. on July 31, 2006. Eyewitness testimony as to the respective positions of Mr. Norton and the forklift, as well as Mr. Norton's conduct at the time of the incident, is conflicting.

Mr. Norton's body was transported from the farm in Live Oak, Florida to the Office of the Medical Examiner in Jacksonville. Dr. Margarita Arruza, the Chief Medical Examiner, examined the body, noting injuries to the head, neck and trunk. She stated that Mr. Norton's injuries were consistent with being crushed by a forklift. Dr. Arruza collected Mr. Norton's blood at 1:05 p.m., approximately five hours after the fatal accident. Blood samples were taken from the decedent's heart and femoral vein. A urine test conducted by Dr. Arruza reported the presence of "metabolite cannabinoid."

At the request of plaintiff, NMS Labs of Willow Grove, Pennsylvania, conducted a drug test on the blood drawn by Dr. Arruza from Mr. Norton's heart. The lab reported the heart blood test results on September 28, 2007. (See Doc. 142-2 at 11.) Defendant Gold Kist requested drug testing of blood drawn by Dr. Arruza from Mr. Norton's femoral vein, coincidentally also by NMS Labs. The femoral blood test results were reported October 25, 2007. (See Doc. 22-4.) The test results are summarized as follows:

|  | **Sept. 28, 2007 NMS Test Heart Blood Sample** | **Oct. 25, 2007 NMS Test Femoral Blood Sample** |
| --- | --- | --- |
| **Delta-9 THC** | None Detected | 4.1 NG/ML[3] |
| **Delta-9 Carboxy THC** | 48 NG/ML | 33 NG/ML |
| **11-Hydroxy Delta-9 THC** | None Detected | None Detected |

Thus, two specimens of Mr. Norton's blood were tested posthumously by the same laboratory rendering different results.

On October 30, 2007, Dr. Bruce A. Goldberger, defendant Gold Kist's expert forensic toxicologist, issued his report in which he opined that the results of the femoral blood test "indicate recent use of marijuana by the Mr. Norton" and that "it is my opinion that Mr. Norton's recent use of marijuana led to an impairment of his normal faculties." (Doc. 122-4 at 2.) In addition to the October lab report, Dr. Goldberger said he had reviewed excerpts from the deposition of two of the

---

[3] "NG/ML" stands for "nanograms per milliliter."

eyewitnesses to the accident and the medical examiner's report.  (Id.)

On February 7, 2008, Dr. Goldberger signed an affidavit after having reviewed additional information which included both the NMS Lab reports based upon the femoral and the heart blood samples; deposition excerpts from two additional eyewitnesses, as well as the deposition of medical examiner Dr. Arruza, and of NMS Lab forensic toxicologist and assistant director Dr. Edward Barbieri, and statements of witnesses set forth in an OSHA investigation report.  Faced with the two conflicting blood test results, Dr. Goldberger discounted the heart test results, stating that "[f]emoral blood specimens are less subject to post-mortem drug changes including redistribution, and are therefore more reliable than blood specimens obtained from the heart."  (Doc. 122-2.)   Dr. Goldberger opined:

> A. The results of the femoral blood analysis that indicate the presence of Delta-9-THC at 4.1 mg/mL is, within a reasonable degree of toxicological certainty, consistent with the ingestion of marijuana within several hours of Jeremy Norton's death,
>
> B. The concentration of Delta-9-THC is associated with euphoria, drowsiness, impairment of concentration, impairment of judgment, distorted perception and reasoning, loss of coordination, and emotional or behavioral control, all of which may contribute to risk-taking behavior.
>
> C. It is my opinion that Mr. Norton's use of marijuana within several hours of his death led to an impairment of his normal faculties and that his normal faculties were impaired at the time of the accident.  This opinion is based upon the blood marijuana results, as

4

well as my education, training and experience.

(Id. (emphasis added).)  He concluded that "Mr. Norton's impaired state due to the use of marijuana ultimately contributed to his death."  (Id.)[4]

## II.     Legal Standard

In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-93, 597 (1993), the Supreme Court instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert scientific testimony, "ensuring that an expert's testimony . . . rests on a reliable foundation." Id. at 597.  Trial courts are required to act as "gatekeepers" to prevent speculative, unreliable expert testimony from reaching a jury.  McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002). A basic foundation for admissibility is that the "proposed expert testimony must be supported by appropriate validation - i.e., 'good grounds,' based on what is known." United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004)(internal notations omitted)(quoting Daubert, 509 U.S. at 590).  "The Daubert requirement that the expert testify to scientific knowledge - conclusions supported by good grounds for every step in the analysis - means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible."  McClain v. Metabolife

---

[4] Plaintiff moves to strike this Goldberger affidavit as being a late expert disclosure, made beyond discovery and expert disclosure deadlines. Plaintiff's motion to strike (Doc. 129) is **DENIED**, and Defendant's Motion To Strike Plaintiff's Supplemental Memorandum Of Law (Doc. 144) is **DENIED**.

Int'l, Inc., 401 F.3d 1233, 1245 (11th Cir. 2005)(internal quotations and citation omitted). "[A]n expert's failure to explain the basis for an important inference mandates exclusion of his . . . opinion." Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329, 1344 (11th Cir. 2003).

"'The burden of laying a proper foundation for the admissibility of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence.'" Hall v. United Ins. Co. of America, 367 F.3d 1255, 1261 (11th Cir. 2004)(citation omitted). "[C]arrying this burden requires more than 'the *ipse dixit* of the expert.'" Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1113 (11th Cir. 2005)(quoting Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 921 (11th Cir. 1998)). The party offering the expert must show that: "'(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" Hudgens, 328 F.3d at 1338 (citation omitted). While there is inevitably some overlap among the basic Daubert requirements - qualifications, reliability, and helpfulness - they should remain distinct concepts and courts should avoid conflating the analysis. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341

(11th Cir. 2003).

The parties do not dispute that Dr. Goldberger is a qualified expert forensic toxicologist. It is the second prong of the required inquiry - the reliability of Dr. Goldberger's methodology in this case - which requires examination. The Daubert court listed four non-exhaustive factors a court may consider in determining whether expert testimony is reliable: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." Allison v. McGhan Medical Corp., 184 F.3d 1300, 1312 (11th Cir. 1999)(citing Daubert, 509 U.S. at 593-94).

### III.    Discussion

At the evidentiary hearing, Dr. Goldberger testified that because there is no *per se* measurement of drug metabolites which indicates marijuana impairment (as there is with alcohol), to determine whether marijuana use caused impairment, the toxicologist must review 1) a "reliable measurement of drug or drug metabolite in the specimen" and 2) "look at the circumstances that led to this accident or death." He testified that the femoral sample of the decedent Norton was the more reliable measurement:

> As a toxicologist working in the field of forensic toxicology for more than 25 years, I have learned that in order to provide the best opinions regarding the results of toxicology evaluations would be to rely on the peripheral blood

7

> samples, that is, femoral or subclavian and other sources that are more distant from the central compartment of the body. . . . I work with . . . blood from leg veins and from shoulder veins so these results would be more accurate, more reflective of what's going on in the body at the time of death versus collecting blood from the heart. We have learned over the years that the results of drug tests of heart blood samples can be misleading, can be wrong . . . . And there's abundant literature to support that a peripheral blood sample like femoral to be more reliable.

Dr. Goldberger based his opinion on impairment on the femoral blood Delta-9 THC test results reflecting the active ingredient, noting that the femoral blood sample showed a 4.1 ng/ml result as compared to a "none detected" report for the heart blood sample. He said that the 4.1 measurement was consistent with "recent use, recent meaning within a few hours of death."[5]

Dr. Goldberger acknowledged that an analysis of post-mortem blood "is much more complicated" than the interpretation of living blood. "[P]ost-mortem blood is oftentimes contaminated by bacteria that . . . have . . . an adverse effect or could have an adverse effect on the stability of the blood itself, as well as what is in the blood." Additionally, he noted that the two samples of blood were tested some 14-15 months

---

[5] Dr. Goldberger testified that the "11 Hydroxy Delta 9 THC" measurement is an active metabolite of Delta-9 THC, that is found in the blood for a very short period of time after ingesting marijuana and in very low concentrations, and is "rarely detected." Both blood tests reported "none detected" of 11-Hydroxy Delta-9 THC. Goldberger also confirmed that the readings for Delta-9 Carboxy THC, an inactive metabolite, though indicating "recent use," does not reveal how recent the use and thus does not support his opinion about impairment.

8

after the death of Mr. Norton, that THC is unstable in blood and that both samples were subject to degradation possibly reducing the level of THC, though he was unable to say to what degree. He stated that it is more difficult to determine the correlation between drug use and its effect post-mortem.

Looking at the heart blood test alone, Dr. Goldberger testified that "we wouldn't have a toxicological measure that would support impairment." Likewise, Dr. Goldberger acknowledged that results of the urine test conducted by the medical examiner Dr. Arruza, indicating "positive" for cannabinoids, cannot be used to support an opinion that Mr. Norton was impaired at the time of his death. Thus, Dr. Goldberger is relying solely on the femoral blood sample as a basis for his impairment opinion.

In support of his position that the femoral blood sample was more reliable than the heart blood sample, Dr. Goldberger testified that "thousands" of articles address post-mortem redistribution of drugs in the blood and the superior reliability of peripheral blood samples, including "a relatively well known editorial in the British Medical Journal" that he co-signed. Dr. Goldberger also referred to NMS forensic toxicologist Dr. Barbieri's deposition discussion of post-mortem drug redistribution.[6]

---

[6] Dr. Goldberger attached to his February 2008 affidavit an article and an excerpt from a textbook, one discussing the effects of marijuana on human behavior, and the other discussing the chemical concentrations of THC at various points in time after ingestion. (Docs. 122-5, 122-8.) At the hearing, counsel for defendants entered into evidence as an exhibit additional articles discussing among other subjects, the

9

Plaintiff introduced an editorial from the 2004 British Medical Journal, signed by Dr. Goldberger and three colleagues, with the sub-heading: "Postmortem measurements of drug concentration in blood have little meaning."[7] (Doc. 139 PX-1.) In the article, the authors state that "[c]ontroversy occurs from the mistaken notion that postmortem laboratory measurements, taken in isolation, can be interpreted effectively."   "[T]here are few if any 'normals' in postmortem toxicology." (Id. (emphasis added).) The article states:

> Furthermore, drug concentrations in blood samples from cadavers are site dependent, higher in some locations and lower in others.  Should the site yielding the lowest or highest result be used?  Or should an average value for three sites be used?  Nobody knows because the process has never been studied systematically.

(Id. (emphasis added).)   Dr. Goldberger and his colleagues cautioned against attempting to use post-mortem blood test results as an indicator of the amount of and time of drug ingestion, saying that extrapolations "are prone to considerable error and generally should be viewed as unreliable and not evidence based." (Id.)

---

duration of the effects of marijuana, what to tell a teenage driver about the effects of marijuana, and how and for what duration marijuana use and increased THC level lead to impairment. (Doc. 139 DX 1.)  Counsel represented that the articles were provided by Dr. Goldberger to document "the studies involved and discussions concerning the impairment of human behavior and function from marijuana."

[7]   Olaf Drummer, A. Robert W. Forrest, Bruce Goldberger & Steven B. Karch, Forensic Science in the Dock, British Medical Journal, (Sept. 18, 2004)(available at httP://www.bmj.com/cgi/content/full/329/7467/636).

> Postmortem measurements of drug concentration in blood have scant meaning except in the context of medical history, the sequence and circumstances surrounding death, and necropsy findings. <u>The paucity of evidence based science, coupled with the pretence that such science exists in regard to postmortem toxicology, leads to the abuse of process, almost certainly to the miscarriage of justice. . . .</u>

(<u>Id.</u> (emphasis added).)  At the hearing, Dr. Goldberger said the article supports his position that his opinion here is based not only on the blood test results, but also upon a consideration of the facts and circumstances surrounding Mr. Norton's death.[8]  <u>See also</u>, <u>State v. Sercey</u>, 825 So.2d 959, 971 n.13 & 14 (Fla. 1st DCA 2002)("Dr. Goldberger testified that it is not possible to 'back extrapolate' with marijuana"; that the driver's "5.5 ng/ml THC and 91 ng/ml cTHC 'corresponds to measurable impairment'" and that impairment can be determined when looking at all of the factors that comprise the accident, including the driver's behavior and the THC/cTHC blood levels).

Post-hearing, defendants submitted two scientific articles in an attempt to bolster Dr. Goldberger's opinion that his impairment opinion is correctly based upon the femoral blood sample results, and that he properly discounted the heart blood

---

[8]   Plaintiff introduced into evidence other articles, abstracts, and an advertisement which say that error can arise from attempting to estimate antemortem drug concentrations and the ingested dose from post-mortem measurements and that the changes in the blood and chosen site for post-mortem blood sample can influence the concentration of drug measured.  (Doc. 139 PX-2, 3, 4, 5.)

sample results.  (Doc. 141.)[9]  Both articles discuss post-mortem redistribution of drugs, the phenomenon relied upon by Dr. Goldberger.  "Postmortem drug concentrations do not necessarily reflect [blood] concentrations at the time of death, as drug levels may vary according to the sampling site and the interval between death and specimen collection."  (Doc. 141-3 at 1.)  "Postmortem drug redistribution [PMR]. . . involves not only distribution from solid organs such as the lungs and liver, but also diffusion from organs such as the stomach to nearby organs such as the heart and the left lobe of the liver."  (Doc. 141-2 at 5.)  Both articles concur that post-mortem blood tests drawn from the femur are more reliable because that location is less susceptible to PMR.  "Heart blood is probably one of the least informative areas for sampling because the redistribution of drug from the lung, liver, or myocardium affects the resulting drug concentration, and should therefore not be used without corresponding peripheral blood sample."  (Doc. 141-2 at 4.)

The articles explain that "basic lipophilic [affinity for lipids] drugs with a large distribution volume are particularly susceptible to PMR.  Nevertheless, this cannot explain the actual PMR of some nonbasic nonlipophilic drugs," which may be affected by a number of factors.  (Doc. 141-3 at 8)  "Basic, highly lipophilic drugs with a volume

---

[9]  Mark C. Yarema, M.D. & Charles E. Becker, M.D., <u>Key Concepts in Postmortem Drug Redistribution</u>, 43 Clinical Toxicology, 235 (2005) (Doc. 141-2); Anne-Laure Pélissier-Alicot, Jean-Michel Gaulier, Pierre Champsaur & Pierre Marquet, <u>Mechanisms Underlying Postmortem Redistribution of Drugs: A Review</u>, 27 Journal of Analytical Toxicology (Nov./Dec. 2003).  (Doc. 141-3.)

distribution greater than 3 l/kg are most likely to undergo PMR. Examples include the tricyclic antidepressants, digoxin, and the amphetamines." (Doc. 141-2 at 1.) <u>Post-mortem redistribution of marijuana or its metabolites was not discussed by either article</u>.

While both articles support the notion that PMR can affect blood samples, they both present data and analysis that post-mortem redistribution of drugs from body organs typically results in a <u>higher</u> concentration of drugs found in blood samples drawn from the heart, which is the opposite of what occurred here. (<u>See</u> Doc. 141-3 at 2-3.)

> As for the peripheral blood sampling sites, all the authors recommend collecting blood from the femoral vein. Femoral blood appears to be the specimen of choice for postmortem toxicological analysis as it is the least subject to PMR, which, in this case, can only come from local tissues such as muscles and fat. Accordingly, it was found that the femoral blood concentrations were less affected by the postmortem time delay than the concentrations in central blood. Femoral blood must ideally be sampled after cross-clamping the iliac vein and the inferior vena cava in order to avoid the risk of drawing blood from these vessels, but such collection is not always possible under the usual forensic autopsy conditions. Even if femoral blood concentrations are more representative of the antemortem blood concentrations than cardiac blood, they are frequently higher than the ante- or perimortem blood concentrations. More surprisingly, in a few cases, femoral blood concentrations were found to be higher than cardiac blood concentrations. This was observed in human cases where resuscitation was attempted, probably causing a shift of cardiac blood into the peripheral vessels.

(Doc. 141-3 at 9.)

Dr. Barbieri's testimony is consistent with the articles about redistribution. However, Dr. Barbieri was unable to explain why the femoral blood sample for Delta-9 THC result in this case was <u>higher</u> than that obtained from the heart blood sample:

> <u>[T]here's not a lot of literature about the potential for post-mortem distribution with marijuana products.</u>  There's some suggestions of it, but it's really not hard and fast, and we don't consider it as an important concept, <u>but it could be, and that's why I'm speculating that there may have been some post-mortem distribution such that the levels in the heart blood may tend to be higher in general than levels in the femoral blood.</u>  So, that would explain the metabolite part of it [Delta-9 Carboxy-THC] being 48 in one case [heart blood sample] and 33 in the other [femoral blood sample]. In terms of the Delta-9 THC, the active component, we have nothing of significance in this one [heart blood sample], and we have a [4.1] nanogram per mil in this one [femoral blood sample].  <u>So, that would be the opposite in effect, so that can't explain that</u>. . . .
> <u>Without knowing how the samples were handled at some other site, and knowing there are problems with some stability issues with Delta-9-THC and its metabolites, all I can say is we have two separated bloods that were done. . . . [I]t's very difficult to explain why we have different values.</u>

(Doc. 143-3 at 2-3 (Barbieri dep. at 63)(emphasis added).) [10]

In response to Dr. Barbieri's deposition testimony, Dr. Goldberger said, "I would consider the possibility that the heart blood sample is not a valid sample. . . . What

---

[10] Both Drs. Barbieri and Arruza agree that blood samples drawn from the femoral vein are typically more reliable. (Doc. 143-3 at 2-3 (Barbieri dep. at 64); Doc. 97-3 at 7 (Arruza dep. at 101)("specimen of choice"); Doc. 142-5 (Arruza dep. at 22).)

that tells me . . . is that the heart is no good, but we have the femoral, which is. . . ." Dr. Goldberger reiterated that when faced with two different lab results, the toxicologist should rely upon the femoral blood sample "if there was not mistake." Alternatively, Dr. Goldberger said that he "thinks" the difference in the two samples is "explained by stability," noting the "completely different" samples collected at different times and stored in different tubes; "one may be more liquidy, one may be more solid. One may contain more drugs, whereas the other doesn't contain as much drug . . . . We look at all the facts of the case." As to the stability theory, Dr. Goldberger conceded: "That's my hypothesis. I don't know for sure," acknowledging that he did not confirm the validity of the lab tests or conduct his own tests of the blood samples. He also acknowledged that there is "little or no data about THC" in the context of the redistribution literature.

**IV.     The Decision**

Dr. Goldberger's opinion that Mr. Norton was impaired by marijuana at the time of his death and that impairment contributed to causing this deadly accident, is based upon 1) Dr. Goldberger's reliance upon the Delta-9 THC results of one of two blood samples and 2) his reading of conflicting eyewitness testimony concerning the circumstances surrounding the accident. As to the first component underlying his opinion, Dr. Goldberger must establish by a preponderance of the evidence that his decision to rely upon the femoral blood test result and to discount the heart blood test

15

result rests upon a reliable foundation, is based upon sufficient facts and data, and is a product of reliable scientific principles and methods applied to this case. See Daubert, 509 U.S. at 589-95; Fed. R. Evid. 702; see also McClain, 401 F.3d at 1245 (if any step in the analysis is unreliable, then the expert testimony is inadmissible).[11]

Dr. Goldberger has not provided an adequate basis for establishing the reliability of the femoral blood test. First, Dr. Goldberger has provided no scientific theory or literature of general acceptance in the relevant scientific community that metabolites associated with marijuana use (as opposed to other types of drugs) are subject to post-mortem redistribution. Second, Dr. Goldberger himself, in written literature, raises serious questions about the reliability of post-mortem measurements of drug concentration in blood See supra pp. 10-11. Third, Dr. Goldberger's reliance upon the femoral blood test fails because he is unable to adequately explain the different results of the two tests in accordance with any accepted scientific principle or theory. It is true that Dr. Goldberger's statement that "[f]emoral blood specimens are less subject to post-mortem drug changes including redistribution, and are therefore more reliable than blood specimens obtained from the heart" is supported by the literature in this record, and confirmed by Drs. Barbieri and Arruza. However,

---

[11] The reliability of the femoral blood test is critical to Dr. Goldberger's ultimate opinion as to whether Mr. Norton was impaired by marijuana in that Dr. Goldberger has conceded that he could not base that opinion on the results of the heart blood test or the urine test. Thus, without establishing the validity of the femoral blood test, Dr. Goldberger's opinion cannot survive the requirements of Rule 702 and Daubert.

the conflicting blood test results in <u>this</u> case do not conform with the working theory in the relevant scientific community (albeit with drugs other than marijuana) that post-mortem drug redistribution in the blood tends to result in a <u>higher</u> concentration of drugs found in heart blood specimens as opposed to femoral blood specimens. Addressing this question, Dr. Barbieri said he has no explanation for the opposite result having occurred here.  Dr. Goldberger's response was that the heart blood specimen was "possibly" "bad," with no basis for saying so except that the result does not conform with his opinion:

> I would consider the possibility that the heart blood sample is not a valid sample, it's not a good sample.  Maybe it's an outlier.  We know that the . . . literature supports the use of femoral blood samples above the use of any other blood sample, from the heart or from the aorta, wherever.  So the literature supports the use of femoral sample if you can get it. . . . So what that tells me . . . is that the heart is no good, but we have the femoral, which is.

Alternatively, Dr. Goldberger hypothesized that the difference may be explained by differences in the stability of the samples, again with no factual basis for this assertion.  In the end, Dr. Goldberger offers only his bald assertion that the <u>higher</u> femoral blood reading should be considered and the <u>lower</u> heart blood result should be totally discounted.[12]

---

[12] Indeed, Dr. Goldberger stated that he did not provide any scientific support for his opinion that the femoral sample was the more reliable result because when he testifies, "I don't rely on scientific evidence to bolster my opinion" and that it is "inappropriate, to bolster one's opinion with other people's work."  Furthermore, Dr.

Reliability cannot be established by the mere *ipse dixit* of an expert. United States v. Frazier, 387 F.3d at 1261; see also Fed. R. Evid. 702 advisory committee's note (2000 amendment)("[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it'").  "[I]f admissibility could be established merely by *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." Frazier, 387 F.3d at 1261. An expert's unexplained assurance that his opinion rests upon accepted scientific methodology is insufficient to establish reliability. McClain, 401 F.3d at 1244; see also Furmanite America, Inc. v. T.D. Williamson, Inc., 506 F. Supp.2d 1126, 1130 (M.D. Fla. 2007).  Ultimately, the Court is faced with two inconsistent blood test results from the same laboratory and no basis in this record for determining why they are different, especially given the highly problematic validity of post-mortem blood testing which Dr. Goldberger himself has recognized.  "[T]here is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 552 U.S. 136, 146 (1997).  Without a valid and reliable basis for establishing the amount of cannabinoid metabolites that was in Mr. Norton's blood at the time of his death, Dr.

---

Goldberger did not bring his file to the Daubert hearing, and thus could not recall if he had both femoral and heart blood test results at the time he made his initial October 30, 2007 report, or specific facts about the incident giving rise to this litigation. For an expert who was called to the Daubert hearing specifically to establish the reliability of his opinion by a preponderance of the evidence, Dr. Goldberger seemed to show up unprepared for the task.

Goldberger's opinion connecting alleged marijuana use by Mr. Norton to the accident rests more upon speculation, conjecture and supposition, than upon reliable scientific principles as applied to the facts of this case. Under Daubert, the Court cannot permit Dr. Goldberger's testimony to be given to the jury.[13]

Upon due consideration, and for the foregoing reasons, it is hereby

**ORDERED**:

1. Plaintiff's Daubert Motion To Exclude Defendant's Expert Toxicologist Testimony And Blood Test Results (Doc. 90) is **GRANTED**.[14]

2. The case remains set on the November 2008 trial calendar.

3. The parties shall appear before United States Magistrate Judge Thomas E. Morris for a settlement conference at a date and time to be determined by Judge Morris. Judge Morris' Chambers will be in contact with the parties to schedule the settlement conference.

---

[13] That marijuana metabolites were detected in Mr. Norton's blood and urine at the time of his death is not relevant unless defendant can establish that Mr. Norton was impaired. Because Dr. Goldberger's proffered opinion that Mr. Norton was impaired by marijuana use at the time of his death and that this alleged impairment contributed to causing the accident at issue fails to meet the Daubert test of reliability, the evidence of the test results evidencing marijuana use at some undetermined time in the past is irrelevant and inadmissible.

[14] Because plaintiff's toxicology expert Dr. Donald Freedman is only proffered to rebut Dr. Goldberger and Dr. Goldberger is disqualified, defendant's Third Daubert Motion/ Motion To Strike/ Motion In Limine As To Dr. Donald Freedman (Doc. 86) is **MOOT**.

**DONE AND ORDERED** at Jacksonville, Florida, this 2nd day of September, 2008.

_____
TIMOTHY J. CORRIGAN
United States District Judge

jl.
Copies to:
Honorable Thomas E. Morris, United States Magistrate Judge
Counsel of Record